

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 8, 2021

**BY ECF**

The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     **Re:**    ***United States v. Christopher Scotto*, 19 Cr. 26 (LTS)**

Dear Chief Judge Swain:

     The Government respectfully submits this letter in connection with the sentencing of defendant, Christopher Scotto, which is currently scheduled for October 14, 2021, at 11:15 a.m., and in response to the defendant's sentencing submission dated September 30, 2021 ("Def. Mem."). For the reasons set forth below, the Government submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or Guidelines) range of 37 to 46 months' imprisonment is appropriate.

## I.   <u>Offense Conduct</u>

     The defendant's conviction arises from his participation in a conspiracy to illegally divert and distribute a large quantity of oxycodone. Oxycodone is a highly addictive, prescription narcotic-strength opioid used to treat severe and chronic pain conditions. Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in five- to thirty-milligram pills to patients. The thirty-milligram tablets of oxycodone—which Scotto obtained and distributed—are extremely potent and intended for patients suffering from extreme pain.. The misuse of prescription painkillers such as oxycodone leads to tens of thousands of annual emergency room visits and adverse medical consequences, including overdoses.

     Because of its addictive qualities and potential for abuse, the distribution of oxycodone is heavily regulated. Physicians and other healthcare professionals must register and be approved by the DEA and state licensing authorities in order lawfully to prescribe oxycodone. Furthermore, federal and state regulations require that, before prescribing oxycodone, physicians must ensure that the prescription is issued for a legitimate medical purpose and in the usual course of generally accepted medical practice.

Because oxycodone is highly addictive and only available with a prescription written by a licensed healthcare professional, oxycodone prescriptions have enormous cash value to drug dealers, such as the defendant, who sell oxycodone pills on the street for thousands of dollars. During the time period covered by this offense, thirty-milligram oxycodone pills, which are popular amongst street-level drug dealers, had a street value of approximately $30 per tablet in New York City, with prices ranging even higher in other parts of the country. Thus, a single prescription for 180 thirty-milligram pills of oxycodone could net a dealer $5,400 in cash or more.

During the course of the conspiracy, the defendant obtained thousands of thirty-milligram pills of oxycodone and distributed them for cash.  The defendant routinely obtained oxycodone for purposes of resale from opioid diverting doctors, such as Martin Tesher and Howard Adelglass, including monthly prescriptions for 180 thirty-milligram pills.[1]  (PSR ¶ 14.)  In addition, the defendant obtained thirty-milligram pills of oxycodone from other "patients" of Doctor Tesher, Doctor Adelglass, and other "pain management" clinics, for purposes of resale.  (PSR ¶ 15.)  For example, in a December 2017 text message exchange with a co-conspirator ("CC-1"), the defendant agreed to purchase a portion of CC-1's oxycodone prescription in exchange for $300. (PSR ¶ 19.)  Likewise, in another December 2017 text message exchange, the defendant told another co-conspirator ("CC-2") that the defendant had "bulk" pills to sell. (PSR ¶ 18.)  Because many of the defendant's co-conspirators were drug addicts without jobs, the defendant often arranged or paid for their transportation to and from doctors' appointments and to pharmacies in order to obtain more pills.

## II. Procedural History

On January 11, 2019, a Southern District of New York grand jury returned an indictment charging the defendant with one count of an oxycodone distribution conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).  (Dkt. No. 1.)  Law enforcement arrested the defendant on or about January 23, 2019, and he was ordered released subject to bail conditions.

On March 10, 2021, the defendant pled guilty, pursuant to a plea agreement, to conspiracy to distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).  The plea agreement and the PSR calculated the defendant's total offense level as 21 based on the following findings: (i) the base offense level is 26 because it is undisputed that the defendant is responsible for diverting 96.84 grams of oxycodone; (ii) two points are subtracted pursuant to the safety-valve provision of U.S.S.G. § 5C1.2(a)(1)-(5) and U.S.S.G. § 2D1.1(b)(18); and (iii) three points are subtracted for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. Accordingly, the total offense level is 21.  (PSR ¶¶ 5, 89.)

At total offense level 21 and Criminal History Category I, the applicable Guidelines range is 37 to 46 months' imprisonment.

---

[1] Dr. Martin Tesher was convicted of opioid diversion in the Eastern District of New York, *see United States v. Martin Tesher*, 17 Cr. 523 (RJD), and Dr. Howard Adelglass was recently indicted in the Southern District of New York for opioid diversion, *see United States v. Howard Adelglass et al.*, 20 Cr. 605 (KMW).

### III. <u>Discussion</u>

#### A. **Applicable Law**

As the Court is well aware, although the Guidelines are no longer mandatory, they provide strong and relevant guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has remarked *en banc*, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a), including, among others, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 50).

#### B. **A Guidelines Sentence is Appropriate in this Case**

Application of the Section 3553(a) factors in this case militate in favor of a Guidelines sentence, including the need to reflect the seriousness of the offense, to promote respect for the

law, to provide just punishment, and to provide both general and specific deterrence.

*First*, a Guidelines sentence is necessary to reflect the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The harms caused by the defendant's conduct are, in some respects, immeasurable. Opioid abuse is ravaging communities in every state in the country. This abuse often begins with and is fueled by prescription painkillers like oxycodone. Indeed, according to the American Society of Addictive Medicine, the misuse of prescriptions painkillers, including oxycodone, has become a leading cause of annual emergency room visits and drug overdose deaths in the United States. For that reason, among others, the distribution of oxycodone is heavily regulated. Nonetheless, through efforts by the defendant and others who are similarly situated, every year substantial quantities of oxycodone are diverted for misuse. The nation and region is in the midst of a long-running opioid epidemic. Indeed, in the twelve-month period between September 2019 and September 2020, drug overdoses reached the highest level of any time in approximately three decades. *See* Abby Goodnough, "Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows," *N.Y. Times*, https://www.nytimes.com/2021/04/14/health/overdose-deaths-fentanyl-opiods-coronaviurs-pandemic.html. Prescription opioid abuse is a common starting point and gateway toward prolonged opioid addiction, including heroin and fentanyl abuse.

Any sentence imposed must reflect that the defendant helped fuel a nationwide epidemic of opioid abuse.

*Second*, the circumstances of the offense and the need for the sentence imposed to promote respect for the law warrant a sentence within the Guidelines' range. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant did not commit his crime alone, hesitantly, fleetingly, or on a small scale. He did so over a relatively long period of time, in substantial amounts, involved others, and acted without any apparent hesitation.

*Third*, the defendant's conduct warrants a Guidelines sentence to promote the ends of both general and specific deterrence. The defendant must understand the high cost of his actions so that he does not repeat the same mistakes. More resonant, is the need for society generally to understand that dealing and diverting prescription pills—and fueling the addiction of others—is unacceptable and will be met with a strong response from law enforcement and the courts.

Notwithstanding the above factors counseling in favor of a Guidelines sentence, the Government acknowledges that the defendant's long struggle with substance abuse is a mitigating factor that weighs in favor of leniency. The defendant should also be credited for his early acceptance of responsibility and his apparent efforts to fight his addiction. Unlike other similarly situated individuals, the defendant appears to have ceased his criminal diversion of opioids prior to his arrest and continued (over the rather lengthy period of pretrial release) to remain clean. However, given the seriousness of the defendant's offense, the mitigating factors do not support a sentence of time served.

**IV.** <u>**Conclusion**</u>

For the foregoing reasons, a Guidelines sentence would be reasonable in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York


By: /s/
    Nicholas W. Chiuchiolo
    Daniel G. Nessim
    Assistant United States Attorneys
    (212) 637-1247 / 2486

cc:    Lisa Scolari, Esq. (by ECF)